UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN ANTHONY,<br><br>  Plaintiff,<br><br>v.<br><br>LIVONGO HEALTH, INC, GLEN TULLMAN, ZANE BURKE, CHRIS BISCHOFF, KAREN L. DANIEL, SANDRA FENWICK, PHILIP D. GREEN, and HEMANT TANEJA,<br><br>  Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Anthony ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**BACKGROUND**

1. This action concerns a proposed transaction announced on August 5, 2020 pursuant to which Livongo Health, Inc. ("Livongo" or the "Company") will be acquired by Teladoc Health, Inc. ("Parent") and Tempranillo Merger Sub Inc. ("Merger Sub," and together with Parent, "Teladoc") (the "Proposed Transaction").

2. On August 5, 2020, Livongo's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Teladoc. Pursuant to the terms of the Merger Agreement, Livongo's stockholders will receive (i) $4.24 in cash, (ii) 0.5920 share of Parent common stock, and (iii) a special cash dividend equal to $7.09 for each Livongo common stock share owned (the "Merger Consideration").

3. Although the number of shares of Parent's common stock that Livongo shareholders will receive is fixed, the market value of the merger consideration will fluctuate with the market price of Parent's common stock and will not be known at the time Livongo shareholders vote to approve the merger agreement. Based on the closing price of Parent's common stock on the New York Stock Exchange ("NYSE") on August 4, 2020, the last trading day before the public announcement of the parties entering into the Merger Agreement, the Merger Consideration represented approximately $158.98 in value for each share of Livongo common stock.  By comparison, based on the closing price of Teladoc common stock on the NASDAQ on September 16, 2020, the Merger Consideration represented approximately $115.89 in value for each share of Livongo common stock, representing a decline of over 25%.

4. Immediately following the completion of the Proposed Transaction, Parent stockholders will own approximately 58% and Livongo stockholders will own approximately 42% of the issued and outstanding shares of the combined company.

5. On September 15, 2020, in order to convince Livongo's public common stockholders to vote in favor of the Proposed Transaction, Defendants knowingly or recklessly filed a materially incomplete and misleading proxy statement (the "Proxy") with the United States Securities and Exchange Commission ("SEC").

6. The Proxy omits material information with respect to the Proposed Transaction, which renders the Proxy false and misleading.  Accordingly, Plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

7. In addition, the Proxy disclosed that a special meeting of Livongo stockholders will be held on October 29, 2020 at 11:00 a.m. EST to vote on the Proposed Transaction (the

"Stockholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so Livongo stockholders can properly exercise their corporate voting rights and make an informed decision on whether to vote in favor of the merger.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9. Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (a) the conduct at issue will have an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; and (c) certain Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. Additionally, the Company's common stock trades on the NASDAQ, which is headquartered in this District.

## THE PARTIES

11. Plaintiff is, and has been, at all times relevant times, a Livongo stockholder.

12. Defendant Livongo is a Delaware corporation and maintains its principal executive offices at 150 West Evelyn Avenue, Suite 150, Mountain View, California 94041. Livongo's common stock is traded on the NASDAQ under the ticker symbol "LVGO."

13. Defendant Glen Tullman is Chairman of the Board of the Company.

14. Defendant Zane Burke is Chief Executive Officer and a director of the Company.

15. Defendant Chris Bischoff is a director of the Company.

16. Defendant Karen L. Daniel is a director of the Company.

17. Defendant Sandra Fenwick is a director of the Company.

18. Defendant Philip D. Green is a director of the Company.

19. Defendant Hemant Taneja is a director of the Company.

**FACTS**

20. Livongo seeks to empower people with chronic conditions to live better and healthier lives. Livongo created a unified platform that provides smart, cellular-connected devices, supplies, informed coaching, data science-enabled insights and facilitates access to medications across multiple chronic conditions to help its members lead better lives. Livongo currently offers Livongo for Diabetes, Livongo for Hypertension, Livongo for Prediabetes and Weight Management, and Livongo for Behavioral Health by myStrength. Livongo created consumer-first experiences with high member satisfaction, measurable, sustainable health outcomes, and more cost-effective care for its members and its clients.

21. Parent is a leading provider of comprehensive virtual healthcare services. Parent provides virtual access to high-quality care and expertise, with a portfolio of services and solutions covering more than 450 medical subspecialties from non-urgent, episodic needs like flu and upper respiratory infections, to chronic, complicated medical conditions like cancer and

congestive heart failure. Parent delivers services on a business-to-business basis to thousands of clients in more than 175 countries around the world.

22. On August 5, 2020, Livongo's Board caused the Company to enter into the Merger Agreement.

23. Under the Merger Agreement, among other things and subject to terms and conditions set forth therein, Merger Sub will be merged with and into Livongo, with Livongo surviving the merger as a wholly-owned subsidiary of Parent.

24. According to the press release announcing the Proposed Transaction:

> Teladoc Health (TDOC), the global leader in virtual care, and Livongo (LVGO), the leading Applied Health Signals company – today announced that they have entered into a definitive merger agreement. This merger represents a transformational opportunity to improve the delivery, access and experience of healthcare for consumers around the world. The highly complementary organizations will combine to create substantial value across the healthcare ecosystem, enabling clients everywhere to offer high quality, personalized, technology-enabled longitudinal care that improves outcomes and lowers costs across the full spectrum of health.
>
> Under the terms of the agreement, which has been unanimously approved by the Board of Directors of each company, each share of Livongo will be exchanged for 0.5920x shares of Teladoc Health plus cash consideration of $11.33 for each Livongo share, representing a value of $18.5 billion based on the closing price of Teladoc Health shares as of August 4, 2020. Upon completion of the merger, existing Teladoc Health shareholders will own approximately 58 percent and existing Livongo shareholders will own approximately 42 percent of the combined company…
>
> **Leadership & Governance**
>
> Jason Gorevic, current CEO of Teladoc Health, will be the CEO of the combined company. Led by Teladoc Health chairman, David Snow, the newly combined Teladoc Health Board of Directors will be composed of eight members of the Teladoc Health Board and five members of the Livongo Board.
>
> **Additional Transaction Details**
>
> The transaction is expected to close by the end of Q4 2020, subject to regulatory and Teladoc Health and Livongo shareholder approvals and other customary

closing conditions. The newly combined company will be called Teladoc Health and will be headquartered in Purchase, New York.

**Advisors**

Lazard served as exclusive financial advisor to Teladoc Health and Paul, Weiss, Rifkind, Wharton & Garrison LLP served as legal advisor. Morgan Stanley served as exclusive financial advisor to Livongo and Skadden, Arps, Slate, Meagher & Flom LLP served as legal advisor.

25. The Merger Consideration is unfair because, among other things, the intrinsic value of the Company is in excess of the amount the Company's stockholders will receive in connection with the Proposed Transaction.

26. It is therefore imperative that the Company common stockholders receive the material information that Defendants have omitted from the Proxy so that they can meaningfully assess whether the Proposed Transaction is in their best interests prior to the vote.

27. Section 6.02 Merger Agreement provides for a no solicitation clause that prevents Livongo from soliciting alternative proposals and constraints its ability to negotiate with potential buyers:

Section 6.02. Lafite Takeover Proposals; Lafite Adverse Recommendation Change.

(a) Except as expressly permitted by this Section 6.02, during the Pre-Closing Period, Lafite shall not, and shall cause its Subsidiaries and Lafite's and each of its Subsidiary's respective directors, officers and employees not to, and shall not authorize or permit its other Representatives to, and shall direct and use its reasonable best efforts to cause each of its Subsidiaries and Representatives not to, directly or indirectly (i) initiate, solicit, propose, induce or knowingly encourage or facilitate the making of any Lafite Takeover Proposal or any inquiries or the making of any proposal that would reasonably be expected to lead to a Lafite Takeover Proposal, (ii) other than informing Third Parties of the existence of the provisions contained in this Section 6.02, enter into, engage in, continue or otherwise participate in negotiations or discussions with, or furnish any non-public information (or access thereto) concerning Lafite or any of its Subsidiaries to, any Third Party in connection with, or for the purpose of knowingly encouraging or facilitating, or otherwise cooperate in any way with any Third Party (or any Representative thereof) with respect to, a Lafite Takeover Proposal, (iii) except as set forth below with respect to a confidentiality agreement in accordance with

6

>Section 6.02(b), recommend or enter into any Contract, letter of intent, acquisition agreement, agreement in principle, memorandum of understanding, option agreement, joint venture agreement, partnership agreement or other agreement with respect to any Lafite Takeover Proposal or (iv) approve, authorize, agree or publicly announce an intention to do any of the foregoing. Upon the execution and delivery of this Agreement, Lafite and its Subsidiaries shall, and shall direct their respective Representatives to, (A) immediately cease and cause to be terminated, and shall not authorize or knowingly permit any Representative to continue, any solicitation and any and all existing activities, discussions or negotiations with any Person conducted heretofore with respect to any Lafite Takeover Proposal or any inquiry or request for information that could reasonably be expected to lead to, or result in, a Lafite Takeover Proposal, (B) promptly, and in any event within one (1) Business Day of the date of this Agreement, request that each Person and its Representatives (other than Tempranillo and its Representatives) that has, prior to the execution and delivery of this Agreement, executed a confidentiality agreement or otherwise received non-public information about Lafite from, or on behalf of, Lafite, in each case, in connection with such Person's consideration of a Lafite Takeover Transaction, to promptly return or destroy all non-public information furnished to such Person by or on behalf of Lafite or any of its Subsidiaries prior to the date of this Agreement and (C) immediately terminate access by any Third Party to any physical or electronic data room relating to any potential Lafite Takeover Transaction. Lafite shall not modify, amend or terminate, or waive, release or assign, any provisions of, any confidentiality or standstill agreement (or any similar agreement) to which Lafite or any of its Subsidiaries is a party relating to any Lafite Takeover Proposal and shall enforce the provisions of any such agreement; provided that Lafite shall be permitted on a confidential non-public basis to release or waive any explicit or implicit standstill obligations solely to the extent necessary to permit the relevant party thereto to submit a Lafite Takeover Proposal to the Lafite Board on a confidential non-public basis and solely to the extent the Lafite Board determines in good faith that the failure to do so would be inconsistent with the Lafite Board's fiduciary duties under Applicable Law. Lafite shall provide written notice to Tempranillo of the waiver or release of any standstill by Lafite within twenty-four (24) hours of such waiver or release, including disclosure of the identities of the parties thereto and circumstances relating thereto. Without limiting the generality of the foregoing, it is understood that any breach of the restrictions set forth in this Section 6.02(a) by any Representative of Lafite (solely for this purpose as if the restrictions on Lafite set forth in this Section 6.02(a) applied directly to such Representatives) shall be deemed to constitute a breach of this Section 6.02(a) by Lafite.

28. In addition, Section 11.04 of the Merger Agreement requires Livongo to pay a $562,810,000 termination fee to Teladoc in the event this agreement is terminated by Livongo and improperly constrains the Company from obtaining a superior offer.

29. Defendants filed the Proxy with the SEC in connection with the Proposed Transaction. As alleged herein, the Proxy omits material information with respect to the Proposed Transaction, which renders the Proxy false and misleading.

30. First, the Proxy omits material information regarding Livongo's and Teladoc's financial projections

31. With respect to the Company's financial projections, the Proxy fails to disclose, for each set of projections: (i) all line items used to calculate adjusted EBITDA and unlevered free cash flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics.

32. With respect to Teladoc's financial projections, the Proxy fails to disclose: (i) all line items used to calculate adjusted EBITDA and unlevered free cash flow; (ii) the Case 2 projections; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

33. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

34. Second, the Proxy omits material information regarding the analyses performed by the Company's financial advisor, Morgan Stanley & Co. LLC ("MS").

35. With respect to MS's *Precedent Transaction Multiples Analysis*, the Proxy fails to disclose the individual multiples and metrics for the transactions observed in the analysis. This information must be disclosed to make the Proxy not materially misleading to Livongo stockholders and provide stockholders with full and relevant information in considering how to vote.

36. With respect to MS's *Discounted Equity Value Analyses*, the Proxy fails to disclose the individual inputs and assumptions underlying the discount rates of 9.4% and 7.5%. This information must be disclosed to make the Proxy not materially misleading to Livongo stockholders and provide stockholders with full and relevant information in considering how to vote.

37. With respect to MS's *Livongo Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the unlevered free cash flows used in the analysis and all underlying line items; (ii) the terminal values for Livongo; (iii) MS's basis for applying a range of perpetual growth rates of 2.5% to 3.5%; (iv) the estimates of net operating loss and tax credit carryforwards; (v) the individual inputs and assumptions underlying the range of discount rates of 8.3% to 10.2%; and (vi) Livongo's net debt or an estimate of net debt. This information must be disclosed to make the Proxy not materially misleading to Livongo stockholders and provide stockholders with full and relevant information in considering how to vote.

38. With respect to MS's *Teladoc Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the unlevered free cash flows used in the analysis and all underlying line items; (ii) the Teladoc street case estimates used in the analysis; (iii) the terminal values for Teladoc; (iv) MS's basis for applying a range of perpetual growth rates of 2.5% to 3.5%; (v) the estimates of net operating loss and tax credit carryforwards; (vi) the individual inputs and assumptions underlying the range of discount rates of 7.3% to 8.2%; and (vii) the net debt of Teladoc. This information must be disclosed to make the Proxy not materially misleading to Livongo stockholders and provide stockholders with full and relevant information in considering how to vote.

39. With respect to MS's *Analyst Price Targets Analyses*, the Proxy fails to disclose: (i) the individual price targets observed in the analyses; and (ii) the sources thereof. This information must be disclosed to make the Proxy not materially misleading to Livongo stockholders and provide stockholders with full and relevant information in considering how to vote.

40. Third, Proxy fails to disclose the circumstances under which MS will be paid "an additional discretionary fee of up to approximately $11 million," and whether defendants intend to pay such fee to MS.

41. The Proxy also fails to disclose the timing and nature of the past services MS provided to the Company and its affiliates.

42. The Proxy further fails to disclose whether MS has provided past services to Teledoc or its affiliates, and if so, the timing and nature of such services and the amount of compensation received by MS for providing such services.

43. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

44. The omission of the above-referenced material information renders the Proxy false and misleading.

45. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## CLAIMS FOR RELIEF

### COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER)

46. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, requires that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

48. Defendants issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

49. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. By virtue of their roles as officers and/or directors, each of the Individual Defendants were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to stockholders as required.

50. The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in preparing and reviewing the Proxy. Defendants were also negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully.

51. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff has no adequate remedy at law.

## COUNT II

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT)

52. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

54. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Proxy.

56. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

57. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

58. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

59. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: September 18, 2020

                                  **MOORE KUEHN, PLLC**

                                  */s/Justin Kuehn*
                                  Justin A. Kuehn
                                  Fletcher W. Moore
                                  30 Wall Street, 8th floor
                                  New York, New York 10005
                                  Tel: (212) 709-8245
                                  jkuehn@moorekuehn.com
                                  fmoore@moorekuehn.com

                                  *Attorneys for Plaintiff*